### UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| **STEPHEN GOODRICH,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **No. 2:12-cv-388-JAW** |
| | ) | |
| **MICHAEL L. SHEEHAN, ESQ., et al.,** | ) | |
| | ) | |
| **Defendants** | ) | |

### RECOMMENDED DECISION ON MOTION TO DISMISS

Defendants Michael L. Sheehan, Esq., and Preti, Flaherty, Beliveau & Pachios, LLP, move to dismiss plaintiff Stephen Goodrich's complaint without prejudice for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) on the ground that, although Goodrich has invoked the court's diversity jurisdiction, he fails to demonstrate that he was no longer a Maine citizen as of the time he filed this suit. *See* Motion To Dismiss ("Motion") (ECF No. 16) at 1-5. Goodrich opposes the Motion, asserting that he was then a citizen of Florida. *See* Plaintiff Stephen Goodrich's Opposition to Defendants' Motion To Dismiss ("Opposition") (ECF No. 21) at 1.[1]

Following the filing of the Motion and Opposition, I permitted jurisdictional discovery. *See* ECF No. 23 at 3-4. Thereafter, I set deadlines for the filing of supplemental briefs. *See* ECF No. 27. The parties filed their supplemental briefs, appending evidentiary materials, *see* ECF Nos. 29 & attachments thereto, 30 & attachments thereto, 32, 33 & attachments thereto, and Goodrich filed a motion for oral argument, *see* ECF No. 28, which I granted, *see* ECF No. 36.

---

[1] The defendants also argued for dismissal of the complaint on the ground that diversity of citizenship was lacking as to plaintiff EVO PowerPay Holdings, LLC ("EVO"). *See* Motion at 5-7. The parties later stipulated to EVO's dismissal without prejudice, *see* ECF No. 25, leaving Goodrich the sole remaining plaintiff and mooting the Motion insofar as it pertained to EVO.

Oral argument was held before me on October 16, 2013. With the benefit of the parties' filings and oral argument, I recommend that the court deny the Motion.

## I.   Applicable Legal Standards

When a defendant moves to dismiss pursuant to Rule 12(b)(1), the plaintiff bears the burden of demonstrating that the court has jurisdiction. *Aversa v. United States,* 99 F.3d 1200, 1209 (1st Cir.1996). The moving party may use affidavits and other matter to support the motion, while the plaintiff may establish the existence of subject matter jurisdiction through extrapleading material. 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350, at 159–60 (3d ed. 2004); *see also Aversa,* 99 F.3d at 1210; *Hawes v. Club Ecuestre el Comandante,* 598 F.2d 698, 699 (1st Cir. 1979) (question of jurisdiction decided on basis of answers to interrogatories, deposition statements, and an affidavit).

"The diversity-jurisdiction statute empowers federal courts to hear and decide suits between citizens of different states, provided the amount in controversy is more than $75,000." *Rodríguez v, Señor Frog's de la Isla, Inc*., 642 F.3d 28, 32 (1st Cir. 2011). "Citizenship for diversity purposes is domicile, and domicile is the place where one is present and intends to stay." *Id*. A party invoking diversity jurisdiction must "prove domicile by a preponderance of the evidence[.]" *Id*. "[D]iversity of citizenship is determined as of the time of suit." *Id*. at 34. Goodrich filed this suit on December 19, 2012. *See* ECF No. 1.

## II.   Factual Background

With respect to his intentions, Goodrich avers that:

1.      In or about November 2011, following his divorce, the sale of his majority interest in PowerPay, Inc. ("PowerPay"), and his resignation as PowerPay's chief executive officer, he decided to permanently relocate from Maine to North Palm Beach, Florida.

2

Declaration of Stephen Goodrich ("Goodrich Decl.") (ECF No. 21-1), attached to Opposition, ¶ 2.

2.      Since that time, he has considered North Palm Beach, Florida, his permanent home.  *Id.*   His home in North Palm Beach is the place to which he always intends to return when he is away from home, whether for business or pleasure.  Supplemental Declaration of Stephen Goodrich in Support of Opposition to Defendants' Motion To Dismiss ("Suppl. Goodrich Decl.") (ECF No. 30-3), attached to Plaintiff Stephen Goodrich's Supplemental Memorandum in Support of His Opposition to Defendants' Motion To Dismiss ("Plt's Suppl. Brief") (ECF No. 30), ¶ 2.

3.      Relocating to Florida was a logical decision for him.  *Id.* ¶ 3.  He has longstanding roots in Florida that go back more than 30 years.  *Id.*   He lived in Florida between 1979 and approximately 1984.  *Id.*   At that time, his mother and brother, as well as his grandparents and several aunts and uncles, also lived in Florida.  *Id.*   He purchased his first home in Florida in 1998.  *Id.*   He began progressively spending more time there and, in the early 2000s, filed income taxes as a Florida resident.  *Id.*   He moved from Florida to Maine in or about 2002 or 2003, when he separated from his first wife.  *Id.*   Beginning in or about 2005, after his first divorce, he invested in and became very active in a number of commercial and residential real estate endeavors in Florida, including approximately 600 acres of land in Okeechobee, Florida, that now support a blueberry farm that he manages.  *Id.* ¶ 4.  He purchased four residential properties in or about 2005 that he renovated and sold.  *Id.*   In 2007 or 2008, he bought residential property not as an investment but for himself, as he was spending more and more time in Florida.  *Id.*

Since July 2012, Goodrich has resided at his current address in North Palm Beach, Florida.   Deposition of Stephen Goodrich ("Goodrich Dep.") (ECF No. 29-1), Exh. A to Defendants' Brief ("Dfts' Suppl. Brief") (ECF No. 29), at 59-61, 73-75; Suppl. Goodrich Decl. ¶ 2; Second Supplemental Declaration of Stephen Goodrich in Support of Opposition to Defendants' Motion To Dismiss ("Second Suppl. Goodrich Decl.") (ECF No. 33-1), attached to Plaintiff Stephen Goodrich's Reply Memorandum in Support of His Opposition to Defendant[s'] Motion To Dismiss ("Plt's Reply") (ECF No. 33), ¶ 10.   As Goodrich testified during his deposition, he provided the funds needed to purchase that residence to his longtime friend and business partner Ron Greenberg, who remains the record owner.   Second Suppl. Goodrich Decl. ¶ 10; Exhs. 2 (ECF No. 33-3), 3 (ECF No. 33-4), & 4 (ECF No. 33-5) thereto; Goodrich Dep. at 30-31.   Prior to that time, he lived "around the corner" on the same street in North Palm Beach. Goodrich Dep. at 60-61, 75.

Through his longstanding personal and professional ties to Florida, Goodrich has developed and maintains a circle of friends with whom he enjoys an active social life.   Suppl. Goodrich Decl. ¶ 5.   He is out most nights for dinner or drinks with his friends or networking for business.   *Id*.

Since July 2012, Goodrich has been employed as the president of National Payment Card Association ("NPCA").   Goodrich Decl. ¶ 3 & Exh. 1 (ECF No. 21-2) thereto.   Prior to that time, he had served on the company's Board of Directors for several years.   Suppl. Goodrich Decl. ¶ 6. His office is located in Coconut Creek, Florida, which is approximately 40 minutes from his home in North Palm Beach.   *Id*. ¶ 3; Suppl. Goodrich Decl. ¶ 6.

NPCA provides decoupled debit payment services to retailers as an alternative to the solutions offered by companies such as Visa and MasterCard.   *Id*. ¶ 7.   It is a small company

with fewer than 20 employees.  *Id.*  Goodrich's primary duties as president include business development, strategic planning, networking, and relationship management with NPCA's merchant customers.  *Id.*  More specifically, he interacts directly with and helps manage NPCA's merchant relationships, reviews business contracts, and develops and expands NPCA's merchant business opportunities as well as its technology licensing opportunities.  *Id.*  He works closely with NPCA's executive team to develop, refine, and execute its strategic vision.  *Id.*  He travels frequently for NPCA, including to destinations all across the United States, to meet with existing and prospective merchant clients and strategic partners and/or to attend periodic trade shows.  *Id.*  Some business trips may be for only one day; others may extend to a full week.  *Id.*

Goodrich reports daily to NPCA's chief executive officer and typically every other day to its chief operating officer.  *Id.* ¶ 8.  He spends on average of one day a week at NPCA.  *Id.*; Goodrich Dep. at 17.  Sometimes he is physically present at the NPCA office for days at a time, and some weeks he is not there at all.  Goodrich Dep. at 17-18.

In addition to his role as NPCA's president, Goodrich is also heavily involved in Bluefield Organic Farms in Okeechobee, Florida, which grows and sells blueberries.  Suppl. Goodrich Decl. ¶ 9.  He regularly visits the farm to oversee and help direct staff as well as to work in the field, something that he enjoys immensely.  *Id.*  He addresses issues pertaining to both NPCA and the blueberry farm every day.  *Id.*[2]

Goodrich registered as a Florida voter on or about May 16, 2012.  Goodrich Decl. ¶ 4 & Exh. 2 (ECF No. 21-2) thereto.  He did not vote in Florida in 2012.  Goodrich Dep. at 22. Goodrich surrendered his Maine driver's license to the Florida Department of Motor Vehicles on

---

[2] Goodrich testified that he previously owned the blueberry farm in Okeechobee, Florida, but now "hold[s] a mortgage on [it]."  Goodrich Dep. at 30.  "[S]o if holding a mortgage constitutes control, I am still involved in that endeavor, trying to babysit my mortgage and hopefully get paid off."  *Id.*

May 16, 2012, and continues to hold and maintain a Florida driver's license.  Goodrich Decl. ¶ 5 & Exh. 3 (ECF No. 21-2) thereto.  He shipped five of his vehicles – all except an unregistered pickup truck – from Maine to Florida on or about June 24, 2012.  Goodrich Decl. ¶ 6 & Exh. 4 (ECF No. 21-2) thereto.  On or about June 12, 2012, he obtained a Florida mobile telephone number, and he continues to maintain it.  Goodrich Decl. ¶ 7 & Exh. 5 (ECF No. 21-2) thereto.[3]

After relocating to Florida, Goodrich designated Nadir Daryaee, M.D., as his primary care physician.  Goodrich Decl. ¶ 8.  Dr. Daryaee's office is located in Palm Beach Gardens, Florida.  *Id*.  Goodrich attends religious services at Christ Fellowship Church in Palm Beach Gardens, Florida.  *Id*. ¶ 11.  He has attended such services probably every other month.  Goodrich Dep. at 21.  He also attends church services in Maine about every other month, and makes financial contributions to the churches in both Maine and Florida.  *Id*.

On April 16, 2012, Goodrich opened personal bank accounts and a safe deposit box at the West Palm Beach branch of Iberia Bank.  Goodrich Decl. ¶ 9 & Exh. 6 (ECF No. 21-2) thereto.  He closed his personal accounts at Gorham Savings Bank on June 5, 2012, leaving the Maine account open only long enough to permit outstanding checks to clear.  Goodrich Decl. ¶ 9 & Exh. 7 (ECF No. 21-2) thereto.

Goodrich identified North Palm Beach, Florida, as his place of residence on his 2011 federal income tax return.  Goodrich Decl. ¶ 10 & Exh. 8 (ECF No. 21-2) thereto.  His 2012 income tax extension request also lists North Palm Beach, Florida, as his place of residence.  Goodrich Decl. ¶ 10 & Exh. 9 (ECF No. 21-2) thereto.

Goodrich continues to own real property in Maine and to travel to Maine to visit his children, who remain in the physical custody of their mother.  Goodrich Decl. ¶ 13.  In his

---

[3] Goodrich states that two Maine mobile telephone numbers shown on his AT&T wireless statement are used by his children.  Goodrich Decl. ¶ 7 & Exh. 5 thereto.

answers to the defendants' interrogatories, Goodrich reported owning or having an interest in 12 properties in Maine.   Plaintiff Stephen Goodrich's Answers to Defendants' First Set of Interrogatories ("Plt's Interrog. Ans.") (ECF No. 29-10), Exh. E to Dfts' Suppl. Brief, ¶ 5.  Eight are commercial or residential rental properties, one is a mixed-use commercial and residential property, and three are personal.   *Id*.   In addition, Greenberg is the record owner of a condominium on Park Street in Portland that is occupied by Goodrich's girlfriend.  Goodrich Dep. at 68; Affidavit of Anne Paquette ("Paquette Aff.") (ECF No. 29-2), Exh. B to Dfts' Suppl. Brief, ¶ 7 & Exh. 4 thereto.   In his answers to interrogatories, Goodrich reported owning or having an interest in only one property in Florida, his residence in North Palm Beach.  Plt's Interrog. Ans. ¶ 5.

Goodrich acquired, or was connected to, all of the Maine properties listed in his answer to interrogatories before he relocated to Florida.   Suppl. Goodrich Decl. ¶ 10.   Although he maintains business interests in Maine, he has no day-to-day role in any of them.  Goodrich Decl. ¶ 12.  He has no involvement in the management of the rental properties, which are managed locally by Pat Tinsman and Carol Sanborn, whom he has known for many years and trusts implicitly.  Suppl. Goodrich Decl. ¶ 10; Goodrich Dep. at 32.  Tinsman has full authority to take all necessary steps and make necessary expenditures to manage the properties.  Suppl. Goodrich Decl. ¶ 10; Goodrich Dep. at 33.  Goodrich is provided with quarterly and/or annual reports but has no day-to-day role of any kind.  Suppl. Goodrich Decl. ¶ 10.

At no time did Goodrich ever believe it to be necessary to divest himself of his ownership interest in his commercial rental properties or other Maine business investments simply because he decided to move to Florida.   *Id*.   He never travels to Maine for the purpose of overseeing management of the commercial rental properties that he owns in Maine.   *Id*.  If he does meet

with anyone concerning any of those properties, it is only because he is already in the state visiting for other purposes. *Id.* He does not maintain an office in Maine. Plt's Interrog. Ans. ¶ 6.

Goodrich's personal properties in Maine include an oceanfront home on Foreside Road in Falmouth, where he resided prior to relocating to Florida and which he describes as a summer residence. *Id.* ¶ 5; Goodrich Dep. at 58-59; Goodrich Decl. ¶ 13 & Exh. 10 (ECF No. 21-2) thereto. He maintains bedrooms for both of his children at the Falmouth home. Goodrich Dep. at 70. At no time did Goodrich ever believe it to be necessary to divest himself of the residential property that he owns in Maine simply because he decided to move to Florida, especially given that his children continue to reside in Maine with their mother. Suppl. Goodrich Decl. ¶ 11. Goodrich's sister serves as the caretaker of his home in Maine, has some of her things there, and keeps the house a little differently than Goodrich did. Goodrich Dep. at 55, 61.

Goodrich did not move furniture (tables, chairs, sofas, rugs, lamps, or beds) from his Falmouth home to his home in North Palm Beach, Florida. *Id.* at 62. As he explained at his deposition, the home in Florida was already fully furnished. Second Suppl. Goodrich Decl. ¶ 9; Goodrich Dep. at 59, 62. He simply had no need to move the furniture from his Falmouth property to his new home in Florida. Second Suppl. Goodrich Decl. ¶ 9. Nonetheless, he did move furnishings from his prior Florida residence to his current one. *Id.* He also moved significant personal effects to Florida, including photos, clothing, items from his children, his collector cars, his primary vehicle, and books. *Id.*; Goodrich Dep. at 62.

At the time that Goodrich and his children's mother divorced in 2003, their son and daughter were only four and one, respectively. Suppl. Goodrich Decl. ¶ 12. At that time, and for the years that followed, Goodrich's children stayed with him at his home in Maine Wednesday

8

nights and every other weekend. *Id.*; Goodrich Dep. at 36-37; Exh. D (ECF No. 29-9) to Dfts' Suppl. Brief (amended divorce judgment dated November 26, 2003, entitling Goodrich to visit with his son and daughter overnight every Wednesday and every other weekend). By informal mutual agreement between Goodrich and his ex-wife, the schedule since has changed. Goodrich Dep. at 37; Second Suppl. Goodrich Decl. ¶ 7.

Goodrich's children are now older, and at the time that he decided to move to Florida, his son was enrolled in boarding school in Massachusetts. Suppl. Goodrich Decl. ¶ 12. The decision to relocate to another state apart from his children did not come easily. *Id.* Nevertheless, Goodrich is fortunate to have the means and professional flexibility to travel to Maine to visit with them and the means to have them with him in Florida during long weekends and school vacations. *Id.*; Goodrich Dep. at 37 (Goodrich's children visit him in Florida "a fair amount"). Also, because the children are older, they are able to fly unaccompanied between Maine and Florida, which makes it easier for Goodrich to spend time with them. Suppl. Goodrich Decl. ¶ 12. Goodrich's children have their own bedrooms in his house in Florida and all of the comforts of their mother's home in Maine. *Id.* ¶ 13. They are not simply transient guests when they are home with Goodrich in Florida. *Id.*

Asked where his girlfriend lives, Goodrich testified, "she stays with me; and she also has a condo . . . in Portland." Goodrich Dep. at 68. He testified that his girlfriend worked a full-time job in Sanford, Maine, until approximately mid-2012 and now works part-time on sporadic basis in a relative's shop in Portland, Maine. *Id.* at 69-70 ("there are some weeks she might do a few days, others none").

Goodrich owns a boat that he keeps at Maine Wharf, one of his Maine properties. *Id.* at 65. He is a member of the Portland Country Club and the Portland Yacht Club but is not a

member of any such club in Florida. *Id* at 35. He is a founding member of the Maine Sabers and occasionally still plays on the team. *Id*. at 63-64.[4] He played in two games this year, both in Maine. *Id*. at 64. Although Goodrich has been a member of the Portland Country Club for three or four years, he is currently a non-resident member, and he has been on the property only twice. Second Suppl. Goodrich Decl. ¶ 11. He retained the membership primarily because there is a significant waiting period to get in. *Id*. He has never used the Portland Yacht Club facility. *Id*. He maintained that membership in case his ex-wife or daughter wanted to take summer sailing lessons. *Id*. He helps coach football in Florida. *Id*.

Goodrich's dentist is in Windham, Maine, and his accountant is in Manchester, New Hampshire. Goodrich Dep. at 19-20, 39. Goodrich's dentist has referred him to dentists in Florida, but as of the date of Goodrich's deposition, August 2, 2013, the last dentist that he had seen was his dentist in Maine. *Id*. at 20. Goodrich maintained a relationship with his Maine dentist only in connection with a sleep apnea device, which Goodrich has not received from him. Second Suppl. Goodrich Decl. ¶ 12. On November 5, 2012, Goodrich met with an estate planning attorney in Portland, Maine. Goodrich Dep. at 56; Exh. 3 to Paquette Aff. Goodrich's accountant and estate planning attorney are trusted professionals with whom he has enjoyed longstanding professional relationships. Second Suppl. Goodrich Decl. ¶ 13. In Goodrich's view, it would have been reckless and unnecessary to change professionals simply because he moved to Florida. *Id*.

Goodrich pays taxes of approximately $50,000 annually on each of his homes – that in Falmouth and that in Florida. Goodrich Dep. at 62. The tax bills for both are sent to his Florida address. *Id*. at 62-63. In fact, all of his bills, including the utility bills for the residential property

---

[4] The defendants represent, in their brief, that the game played by the team is football. *See* Dfts' Suppl. Brief at 9.

that he owns in Maine, are addressed and delivered to him at his home in Florida.  Suppl. Goodrich Decl. ¶ 19.

When asked at his deposition on what date he moved to Florida, Goodrich said that he could not provide a date because it was "a process[,]" although it was sometime in 2012. Goodrich Dep. at 13.  Goodrich did not know how many days he was in Florida between June 1, 2012, and July 31, 2013.  *Id.* at 28-29.  *See also* Plt's Interrog. Ans. ¶¶ 3-4 (it is "impossible for [Goodrich] to state with certainty" how many total days or parts of days he spent in Maine and Florida in 2011 and 2012; however, "in 2011, [he] spent the majority of [his] time in Maine[,]" and "[b]eginning towards the end of 2011 and early 2012, [he] began to spend more of [his] time in Florida, until [he] permanently relocated to Florida by the late spring or early summer of 2012").

The defendants submit analyses by Anne Paquette, an employee of Petruccelli, Martin & Haddow, LLP, and Ashley Janotta, a third-year law student at the University of Maine School of Law retained by Petruccelli, Martin & Haddow, LLP, of documents produced by Goodrich, including his credit card statements, Outlook calendar, and electricity bills for his Maine property.  Paquette Aff. & Exhs. 1-3 thereto; Affidavit of Ashley Janotta ("Janotta Aff.") (ECF No. 29-3), Exh. C to Dfts' Suppl. Brief, & Exhs. 1 (ECF Nos. 29-4 & 29-5), 2 (ECF No. 29-6), 3 (ECF No. 29-7), & 4 (ECF No. 29-8) thereto.

Using all credit card statements produced by Goodrich, Paquette created an Excel spreadsheet purporting to detail the dates on which Goodrich was charged for "age management treatments" at the Age Management Center on Congress Street in Portland, Maine, and the dates on which he was charged for services at Orthopedic Associates in Portland, Maine.  Paquette Aff. ¶¶ 4-5 & Exhs. 1-2 thereto.  Those spreadsheets show 32 charges for age management

11

treatments between June 23, 2011, and June 28, 2013, including five from October through December 2012 and eight in 2013, and seven charges by Orthopedic Associates from June 9, 2011, through March 22, 2013.  Exhs. 1-2 to Paquette Aff.

Very few of the credit card payments to Age Management Center relate to office visits, and none after September 2012.  Second Suppl. Goodrich Decl. ¶ 2.  The defendants' counsel did not inquire about those charges during Goodrich's deposition.  *Id*.  Had he done so, Goodrich would have explained that, after a near-fatal spine infection in 2011, he treated with Michael Bedecs, D.O., at the Age Management Center.  *Id*.  Dr. Bedecs prescribed a protocol including medication and supplements to regain Goodrich's weight and strength.  *Id*.  Goodrich continued to follow the medication and supplement regimen that Dr. Bedecs prescribed throughout 2012 and 2013.  *Id*.  The last time that he treated with Dr. Bedecs at the Age Management Center was on September 13, 2012.  *Id*.; Declaration of Michael Bedecs, D.O. ("Bedecs Decl.") (ECF No. 33-6), attached to Plt's Reply, ¶ 3.  All charges after September 13, 2012, were for medications and/or supplements.  *Id*.  Further, Goodrich has on occasion visited with Dr. Bedecs in Florida.  Second Suppl. Goodrich Decl. ¶ 2.  Dr. Bedecs is a duly licensed osteopathic physician in Maine and Florida.  Bedecs Decl. ¶ 1.

Goodrich had shoulder surgery in Maine in 2012 or early 2013.  Suppl. Goodrich Decl. ¶ 15.  He treated with the same surgeon who had previously operated on him numerous times in the past.  *Id*.  He has undergone five surgeries over the years, four on his knee and one on his shoulder, at Orthopedic Associates in Portland.  Second Suppl. Goodrich Decl. ¶ 12.  Of the seven office visits noted in his calendar, only one in 2012 occurred after May 2012 and only one occurred in 2013. *Id*.  Due to Goodrich's longstanding relationship with the surgical practice and because he has the means to do so, he continued to seek follow-up care from the practice

following his last surgery.  *Id.*  He no longer is under the Maine surgeon's care.  Suppl. Goodrich Decl. ¶ 15.  His Florida primary care physician has referred him to Florida specialists, as needed. *Id.*

Janotta created Excel spreadsheets for each of the three issuers of Goodrich's credit card statements, American Express, Mileage Plus United, and U.S. Airways Dividend Miles MasterCard, for the years 2011 and 2012 and the partial year 2013, recording, by date of transaction, each transaction that was made in Maine and each that was made in Florida.  Janotta Aff. ¶¶ 3-4.  She analyzed the results both by month per card issuer and cumulatively for the entire time period for each card issuer and all three in the aggregate.  *Id.* ¶¶ 4-5 & Exhs. 1-2 thereto.  Her analysis shows a total of 106 transactions in Maine and eight in Florida in September 2012, 123 in Maine and 29 in Florida in October 2012, 123 in Maine and three in Florida in November 2012, 142 in Maine and 33 in Florida in December 2012, 120 in Maine and 143 in Florida in January 2013, 159 in Maine and 82 in Florida in February 2013, and 126 in Maine and 41 in Florida in March 2013.  Exhs. 1-2 to Janotta Aff.  She arrived at an aggregate total, for all three cards for the entire time period, of 2,811 transactions in Maine and 715 in Florida.  Janotta Aff. ¶ 5 & Exh. 2 thereto.

She stated that, in analyzing this data, she encountered one notable apparent anomaly: that, although in January 2013, the number of credit card transactions in Florida exceeded the number of Maine, many of those transactions took place during times that she determined that Goodrich was Maine.  Janotta Aff. ¶ 7 & Exh. 2 thereto.  She noted that it appeared that someone else was using the card during this time.  Exh. 2 to Janotta Aff.

Goodrich and his bookkeeper, Michael Brnger, performed a detailed audit of his credit card statements to reconstruct his whereabouts during the period from September 1, 2012,

through December 31, 2012.  Second Suppl. Goodrich Decl. ¶ 3.  They reviewed the same credit card statements that Goodrich had produced to the defendants and followed the same methodology employed by Janotta.  *Id*.  Goodrich and Brnger discovered 22 errors, including 21 instances in which Janotta incorrectly placed Goodrich in Maine when the records unequivocally placed him in Florida or elsewhere.  *Id*. & Exh. 1 (ECF No. 33-2) thereto.  In addition to those errors, Janotta's methodology was flawed because she failed to exclude (i) recurring monthly autopay and/or direct-pay transactions that would not have correlated to Goodrich's physical location at the time of the transaction, (ii) internet and/or telephonic transactions that would not have correlated with any physical location, and (iii) authorized credit card purchases initiated by other people with access to Goodrich's credit card accounts that would not have correlated with Goodrich's physical location at the time of the transaction.  Second Suppl. Goodrich Decl. ¶ 3.

During Goodrich's deposition, he was not asked about his credit card or cell phone use or the statements that he produced.  Suppl. Goodrich Decl. ¶ 18.  To the extent that the credit card statements include purchases in multiple states, including Maine, they do not reflect his whereabouts at any given time because his ex-wife, both of his children, his stepson, his girlfriend, and his bookkeeper all have access to his credit card account.  *Id*.  His children reside with their mother in Maine.  *Id*.  His stepson lives in Chicago.  *Id*.  His bookkeeper lives in Maine.  *Id*.  Further, his son and his girlfriend have additional credit cards under his account.  *Id*.  All three credit cards bear the same account number.  *Id*. & Exh. 1 (ECF No. 30-4) thereto (examples from credit card statements reflecting multiple transactions on the same day in different states).

In addition, a number of businesses have preauthorization to charge Goodrich's account, including businesses located in Maine.  Second Suppl. Goodrich Decl. ¶ 4.  Those charges are

14

made to his account independent of his physical location.  *Id.*  Similarly, his accountant bills his credit card for his services from his office in Manchester, New Hampshire, but Goodrich is never in his office when that occurs.  *Id.*  The pie charts accompanying the defendants' brief thus do not accurately depict Goodrich's whereabouts as a function of his credit card use.  *Id.*  Similarly, Goodrich's cell phone account includes separate lines for his children and his sister, and his cell phone bills reflect usage by multiple people in different locations.  Suppl. Goodrich Decl. ¶ 18.

Janotta also reconstructed Goodrich's air travel during the period for which he produced records by using airline statements and credit card statements showing airline ticket purchases and confirming the result by checking it against the locations of credit card transactions before and after the date of travel.  Janotta Aff. ¶ 6 & Exh. 3 thereto.  She determined that, for the period from June 1, 2011, through December 31, 2011, Goodrich spent a total of 201 days in Maine (97 percent), three days in Florida (1.5 percent), and three days in both states (1.5 percent), in 2012, he spent a total of 280 days in Maine (76.5 percent), 46 days in Florida (12.5 percent), and 40 days in both (11 percent), and from January 1, 2013, through June 30, 2013, he spent a total of 95 days in Maine (52 percent), 57 days in Florida (32 percent), and 29 days in both (16 percent).  Exh. 3 to Janotta Aff.  Although Goodrich primarily travels on commercial airlines, he also flew on private aircraft from time to time between 2011 and 2013.  Second Suppl. Goodrich Decl. ¶ 5.

The reason why Goodrich spent the majority of his time in Maine during the period from September 2012 through December 2012, and particularly that November, was because the stock purchase deal relating to the sale of his remaining interest in PowerPay became highly contentious due to the adverse tax consequences giving rise to this lawsuit.  *Id.* ¶ 6.  Goodrich felt at the time that it was critically important for him to remain close to PowerPay's offices and

nearer to the buyers until the transaction closed in late December. *Id*. As the defendants'
analysis reveals, he began spending significantly greater time at his home in Florida following
the closing. *Id*.[5]

Janotta also analyzed the electricity bills for Goodrich's home in Maine for the period
from May 2011 through June 2013. Janotta Aff. ¶ 8. She created a graph indicating that the cost
of electricity remained constant before and after the filing of this suit. *Id*. & Exh. 4 thereto.

Using an Excel spreadsheet created by Janotta, Paquette color-coded Goodrich's Outlook
calendar entries for the period from January 5, 2012, through July 14, 2013, to highlight the
number of entries for Maine appointments/events compared with Florida appointments/events.
Paquette Aff. ¶ 6 & Exh. 3 thereto. Goodrich has no other calendar. Goodrich Dep. at 40. The
number of Maine entries exceeds the number of Florida entries. Exh. 3 to Paquette Aff.

As Goodrich testified during his deposition, not every event recorded on his calendar
actually occurred. Suppl. Goodrich Decl. ¶ 14; Goodrich Dep. at 43, 46 (testifying that because
an event or appointment was noted, it did not necessarily mean that he was there). Moreover, the
calendar events that he produced are not indicative of his whereabouts on a regular basis. Suppl.
Goodrich Decl. ¶ 14. Goodrich strives to maximize his time with his children but does not travel
to Maine from Florida on a regular basis for the purpose of meeting his daughter's school bus or
driving her to riding lessons. *Id*. The calendar entries do not reflect regular visits with his
children, but were entered as reminders so that he would be aware of their schedules in case he
was in Maine and able to participate with them or assist his ex-wife while in the area. Second
Suppl. Goodrich Decl. ¶ 8; Goodrich Dep. at 43 (testifying that he thought his daughter's

---

[5] Goodrich sold a controlling portion of PowerPay in 2011 and the remainder in 2012. Goodrich Dep. at 54.

horseback riding camp was "a regular entry" on his Outlook calendar, so he was not sure if he was there or not).

Since filing his original declaration in July 2013, Goodrich has joined the North Palm Beach Country Club and is in the process of joining the PGA National Gold Club located in Palm Beach Gardens, Florida.  Suppl. Goodrich Decl. ¶ 16.  Membership in the North Palm Beach Country Club required proof of Florida residency, which Goodrich documented by providing copies of his utility bills addressed to him at his primary residence in West [sic] Palm Beach, Florida.  *Id*.  In addition, he is in the process of selling one of his two boats still located in Maine and is preparing the other to be moved to Florida.  *Id*.  He also works out regularly at the local gym near his home.  *Id*.  He does not belong to any gym in Maine.  *Id*.

During his deposition, Goodrich was asked whether he relocated to Florida to save money on his taxes, implying that he left Maine for financial reasons.  *Id*. ¶ 17; Goodrich Dep. at 72-73.  Although residing in Florida has certain tax advantages, that was not his motivation for moving there.  *Id*.  As he testified, he would have saved several million dollars in taxes had he relocated to Florida earlier than when he sold his majority interest in PowerPay.  *Id*.  Moreover, as he stated in his original declaration, he relocated to Florida because of a combination of major life events, including his divorce from his second wife in November 2011, the sale of his remaining interest in PowerPay, and his resignation as PowerPay's chief executive officer in or about November 2011.  Second Suppl. Goodrich Decl. ¶ 17.  He also decided to move in part due to his father's terminal illness and eventual passing in 2012.  *Id*  Prior to that, he was his father's primary support for doctor visits, treatments, and helping maintain his morale.  *Id*.

### III. Discussion

"A person's domicile is the place where he has his true, fixed home and principal establishment, and to which, whenever he is absent, he has the intention of returning." *Meléndez-García v. Sánchez*, 629 F.3d 25, 41 (1st Cir. 2010) (citation and internal quotation marks omitted). "There is, ordinarily, a presumption of continuing domicile." *Id*. (citation and internal quotation marks omitted). "In order to show change of domicile, a party must establish that he (1) was present in the new domicile and (2) intended to remain there." *Id*. (citation and internal punctuation omitted). With respect to the second required showing:

> The following factors are relevant in determining whether a party intends to make his home in a given state: the place where civil and political rights are exercised, taxes paid, real and personal property (such as furniture and automobiles) located, driver's and other licenses obtained, bank accounts maintained, location of club and church membership and places of business or employment. While no single factor is controlling, some courts have presumed domicile in a state is established where a party is registered to vote. This circuit, however, has not recognized a presumption, though it has said that the place a person is registered to vote is a weighty factor in determining domicile.

*Id*. (citations and internal quotation marks omitted). "[A] party need not check off *every* . . . [listed] factor to satisfy her burden[.]" *Señor Frog's*, 642 F.3d at 33 (emphasis in original). "No single factor is dispositive, and the analysis focuses not simply on the number of contacts with the purported domicile, but also on their substantive nature." *Hall v. Curran*, 599 F.3d 70, 72 (1st Cir. 2010) (citation and internal quotation marks omitted). Ties that "could not be easily undone" are favored over "more easily established ties[.]" *Id*. (citation and internal quotation marks omitted).

### A.  The Parties' Arguments

Goodrich contends that the evidence that he has produced leads to "the inescapable and irrefutable conclusion . . . that [he] was a Florida citizen on the day he filed this action on

December 19, 2012."  Plt's Suppl. Brief at 1.  He argues that all of the customary factors that courts consider point in that direction: long before he filed suit, he had, among other things, established a residence in Florida, registered to vote there, obtained a Florida driver's license, opened a Florida bank account, closed his Maine bank account, joined a Florida church, obtained a Florida cell phone number, listed himself as a Florida resident on his federal income tax return, and selected a Florida primary care doctor.  *See id*. at 11-12.  He adds that he has deep and longstanding ties to Florida, is employed as the president of a Florida-based company, manages a Florida agricultural business, has no daily or regular involvement in any business enterprise located in Maine, and receives mail, including utility bills pertaining to his Maine residence, at his address in Florida.  *See id*. at 12.

He reasons that his Maine ties – his maintenance of a home in Maine, where his children reside with their mother, his Maine business interests, his treatment by a Maine surgeon after moving to Florida, and the fact that he may be present in Maine more days in a given month than he may be present in Florida – make no material difference.  *See id*. at 12-13.

He asserts that, for purposes of Florida's tax-exemption statute, he satisfies seven of 10 criteria for the establishment of a permanent residence in Florida, and for purposes of Maine's voter eligibility statute, applicable criteria would define him as a Florida, rather than Maine resident.  *See id*. at 13-15.

The defendants dispute that Goodrich proves his switch to Florida citizenship, asserting that "even now, today, Mr. Goodrich remains a Maine citizen as a matter of objective fact." Dfts' Suppl. Brief at 3.  They argue that:

1.      While Goodrich can plausibly state that his time in Florida increased to some degree after the middle of 2012, that is not enough.  *See id*. at 5.

2.      Goodrich was unable or unwilling under oath to state when he became a citizen of Florida and how many days he has spent there.  *See id*.

3.      The defendants' analyses of Goodrich's document production demonstrate that he continued to spend a substantial amount of time in Maine.  *See id*. at 5-7.  There has not been a single month in 2012 or 2013 in which Goodrich has been in Florida for even half of the time. *See id*. at 10-11.

4.      Goodrich maintains a substantial home in Falmouth, continues to see his young children in Maine on many days, never moved his furniture from Falmouth to Florida, owns no property in Florida but owns a number of properties in Maine, owns a boat that is kept at Maine Wharf, maintains his memberships at the Portland Country Club and the Portland Yacht Club but is not a member of similar clubs in Florida, continues to play football in Maine, continues to see a dentist in Maine and receive orthopedic and age management services in Maine, uses an accountant in New Hampshire, and met with an estate planning attorney in Maine.  *See id*. at 7-9.

5.      Although Goodrich registered to vote in Florida, he did not vote there in 2012, a presidential election year in which Florida was a "battleground" state, and he spends little time in the NPCA office in Florida.  *See id*. at 10.  "His voter registration and driver's license and his designated primary care physician in Florida are nothing compared to his physical presence in Maine, as evidenced by his substantial Falmouth residence and the overwhelming significance of his Maine business activities compared to his ceremonial drive-by job in Florida."  *Id*. at 11. "Maine is the center of Mr. Goodrich's most important personal relationships, with his young children who live in Maine and with his girlfriend who lives in Maine, and even with his boat that is tied up in Maine."  *Id*.

Goodrich rejoins that the Janotta analysis on which the defendants principally rely is flawed both in its methodology and application and, more fundamentally, he is aware of no cases that "reduce the question of domicile to a numbers game." *See* Plt's Reply at 1-3. He asserts that Janotta (i) used a flawed methodology in that she failed to exclude transactions that would not correlate with his whereabouts, such as recurring monthly autopay and direct-pay transactions, internet and telephone transactions, and purchases made by other authorized users of his credit cards and (ii) made mistakes implementing her own methodology. *See id.* at 2-3.

He adds that:

1.     The defendants erroneously assumed that he visited the Age Management Center in Maine every time that a charge from that office appeared on his credit card statement. *See id.* at 4.

2.     While it is true that he spent additional time in Maine for the period September 2012 through December 2012, that is not inconsistent with his establishment of his domicile in Florida. *See id.* at 5. He spent more time in Maine then because the stock purchase deal relating to the sale of his remaining interest in PowerPay became highly contentious due to the adverse tax consequences giving rise to this lawsuit. *See id.* The defendants' own analysis reveals that he began spending significantly greater time in Florida following the closing, as one might expect of someone domiciled in Florida. *See id.*

3.     The defendants' reliance on Goodrich's children's activities and on the visitation schedule set forth in the 2003 divorce decree is misplaced. *See id.* at 5-6. Goodrich and his ex-wife have modified the schedule informally as the children have grown older and more able to visit with Goodrich in Florida. *See id.* at 6. In addition, Goodrich's calendar entries regarding

21

his children's events do not necessarily mean that he attended those events.  *See id*.  He often placed those events on his calendar as reminders in case he was in Maine.  *See id*.

4.      Whether Goodrich moved his home furnishings is irrelevant.  *See id*.  He had no need to move furnishings because his Florida home was fully furnished.  *See id*.  He did move his significant personal effects to Florida.  *See id*.

5.      He paid for his Florida home.  *See id*. at 7.

6.      Other Maine connections highlighted by the defendants are insignificant, and some are diminishing; for example, Goodrich is in the process of moving the boat moored at Maine Wharf to his home in Florida.  *See id*.

## B.  Analysis

Goodrich meets his burden of overcoming the presumption that, as of the time he filed this action, he continued to reside in Maine, his conceded domicile through sometime in 2012.

First, Goodrich demonstrates that, prior to the time he filed the Complaint, he was present in Florida.  He had maintained a residence in Florida for some time but, in July 2012, moved to the residence that he avers he considers his home, in North Palm Beach, Florida.  In July 2012, he began employment as president of a Florida-based company, the NPCA, and he is present at its Florida offices on average one day per week.  Even the Janotta charts, despite the flaws identified by Goodrich in Janotta's methodology and its application, collectively indicate that Goodrich was present in Florida for at least a part of every month in 2012 and January through June 2013.

The defendants cite no authority standing for the proposition that an individual must be present in a state for a certain percentage of time to be considered a domiciliary of that state.  *See generally* Dfts' Suppl. Brief; Defendants' Reply Memorandum ("Dfts' Reply") (ECF No. 32).

By contrast, Goodrich cites *Nahan v. Pan Am. Grain Mfg. Co*., 967 F. Supp. 648 (D.P.R. 1997), for the opposite proposition.  *See* Plt's Suppl. Brief at 13 (quoting *Nahan*, 967 F. Supp. at 651) ("[D]omicile is an individual's permanent place of abode where he need not be physically present, and residence is where the individual is physically present much of the time. An individual consequently may have several residences, but only one domicile.") (citation and internal quotation marks omitted).  Goodrich points out that the Janotta charts, despite their flaws, generally bear out his claim that he spent a considerable amount of time in Maine for the period from September through December 2012 in connection with the sale there of his remaining interest in PowerPay but then, following the sale, he returned "home" and his time in Florida increased.  *See* Plt's Reply at 5.

In addition, the First Circuit has noted that "there is no minimum period of residency required."  *Bank One, Texas, N.A. v. Montle*, 964 F.2d 48, 53 (1st Cir. 1992) (citation and internal quotation marks omitted).  "A citizen of the United States can instantly transfer his citizenship from one state to another."  *Id*. (citation and internal quotation marks omitted).[6]

Second, Goodrich demonstrates by a preponderance of the evidence that, prior to the time he filed the Complaint, he intended to remain in Florida.  As a threshold matter, he declares under oath that this was so.  While documentation can call into question the credibility of such a declaration, *see, e.g., id*. at 52-53, the documentation in this case bolsters Goodrich's claim.

Goodrich produces evidence that, prior to the time he filed his Complaint, he had registered to vote in Florida, paid taxes there, maintained a residence there with bedrooms for his children having all the comforts of their mother's home in Maine, transported five of his six vehicles from Maine to Florida (all but an unregistered pickup truck), surrendered his Maine

---

[6] At oral argument, the defendants' counsel did not contest that citizenship can be instantly transferred, but contended that Goodrich has not shown that he ever made that transfer from Maine to Florida.

driver's license and obtained a Florida one, closed out a Maine bank account and opened one in Florida, established relationships with a church and a primary care physician in Florida, and commenced a job with a Florida company.  While "a party need not check off *every* . . . [listed] factor to satisfy her burden" of proving a change in citizenship, *Señor Frog's*, 642 F.3d at 33 (emphasis in original), Goodrich checks off nearly all of them.

The defendants attempt to undermine the substantiality of this showing with respect to several factors, asserting, for example, that Goodrich (i) frequently visits his young children in Maine, where he maintains a substantial home with bedrooms for them, *see* Dfts' Suppl. Brief at 7-8, with Maine being "the center of [his] most important personal relationships, with his young children who live in Maine and with his girlfriend who lives in Maine," *id*. at 11, (ii) moved no furniture from his Falmouth home to Florida, as a result of which one can draw a reasonable inference that, rather than moving to Florida, he simply added a home there, *see id*. at 8, (iii) owns no property in Florida but does own a substantial number of properties in Maine, *see id*., (iv) maintains his boat at the Maine Wharf, one of the many properties in Maine that he owns, *see id*. at 9, (v) is a member of the Portland Country Club and the Portland Yacht Club but not a member of any similar clubs in Florida, *see id*., (vi) continues to play football in Maine, *see id*., (vii) continues to obtain dental and medical services in Maine and use a New Hampshire accountant and a Maine estate planning attorney, *see id*., (viii) registered to vote in Florida but did not vote there in 2012, a presidential election year in which Florida was a "battleground" state, *see id*. at 10, (ix) apparently was in Maine every day in November 2012, *see id*., (x) seeks, through his Florida voter registration, driver's license, and cell phone, "to create a façade of Florida citizenship to fool Maine Revenue Services," *see id*., and (xi) has Maine business

activities of "overwhelming significance" compared with "his ceremonial drive-by job in Florida[,]" *id.* at 11.

In so arguing, the defendants overemphasize the significance of Goodrich's Maine contacts and minimize that of his Florida ones.  Although Goodrich continued to own and maintain a substantial residence in Maine and was not the owner of record of his comparable Florida residence, he supplied the funding to purchase the Florida residence.  Although, per the terms of the 2003 divorce decree, Goodrich's children resided with their mother in Maine, and Goodrich maintained bedrooms for them at his Falmouth residence and visited with them in Maine, they also spent significant time visiting him in Florida, and he maintained bedrooms for them at his Florida residence with all of the comforts of their mother's home in Maine.  Although Goodrich's girlfriend has a condo in Portland, Maine, she stays with him, ceased a full-time job in Maine in about mid-2012, and now works only sporadically in Maine.

Goodrich did not move any furniture from Maine to Florida because he did not have to: his Florida residence was fully furnished.  Moreover, he moved personal belongings to Florida that one would expect to find in a person's "true, fixed home and principal establishment," *Sánchez*, 629 F.3d at 41 (citation and internal quotation marks omitted), such as photos, clothing, items from his children, his collector cars, his primary vehicle, and books.

Goodrich owned commercial properties in Maine that may well be, as the defendants' counsel contended at oral argument, his economic center of gravity.  However, Goodrich did not actively manage them.  Instead, he delegated their management to trusted employees.  By contrast, he was actively involved on a day-to-day basis in fulfilling the varied duties of his job as the president of a Florida company, NPCA, as well as in the management of a Florida

blueberry farm.  His NCPA job was not, as the defendants characterize it, a "ceremonial drive-by job[.]"  Dfts' Suppl. Brief at 11.

While Goodrich maintained social, business, church, doctor-patient, and professional relationships in Maine, he also had longstanding connections to Florida and maintained or had begun as of the time of the filing of the Complaint to establish social, business, church, doctor-patient, and professional relationships there.  Moreover, Goodrich explains that he is a non-resident member of the Portland Country Club and has been on the property only twice, has never used the Portland Yacht Club facility and maintains that membership for the use of his ex-wife and daughter, helps coach football in Florida, and received substantially fewer "age management" treatments in Maine than the Janotta analysis indicates.

Although, as the defendants' counsel correctly noted at oral argument, the factors listed by the First Circuit as relevant to analysis include "the place where civil and political rights are *exercised*," *Sánchez*, 629 F.3d at 41 (citations and internal quotation marks omitted) (emphasis added), and Goodrich did not vote in Florida in 2012, the First Circuit also stated that "the place a person is *registered to vote* is a weighty factor in determining domicile." *Id*. (citations and internal quotations omitted) (emphasis added).  Goodrich had registered to vote in Florida prior to the time of the filing of the complaint, weighing heavily in favor of a finding of Florida domicile as of then.

To the extent that the defendants speculate that Goodrich engineered a sham change of domicile to fool Maine Revenue Services or endeavored to create diversity jurisdiction where none exists, *see* Dfts' Suppl. Brief at 10-11, as the defendants' counsel acknowledged at oral argument, Goodrich's motive is irrelevant, *see, e.g., Bank One*, 964 F.2d at 53 ("It has long been the rule that motive for the change in residence is irrelevant in determining domicile. . . . [A]

change of domicile will be recognized even if it was made for the purpose of creating diversity jurisdiction[.]") (citations and internal punctuation omitted).  In any event, the defendants' suppositions are not well-founded.  Goodrich explains that, had he wanted to engineer a move to Florida to save taxes, he would have saved significantly more money had he moved to Florida while he still owned PowerPay.  With respect to diversity jurisdiction, the evidence bears out that Goodrich took significant steps toward establishing Florida citizenship in the wake of several major life changes, including the sale of his interests in PowerPay and his second divorce.  Those steps were taken prior to the events that led to the filing of this suit.[7]

Finally, Goodrich's post-complaint activity bolsters his showing of a change of domicile to Florida.  *See Señor Frog's*, 642 F.3d at 33 ("Even though they are not part of the primary calculus, post-suit happenings may bear on the sincerity of a professed intention to remain.").  Since filing his declaration in July 2013, Goodrich has joined the North Palm Beach Country Club and is in the process of joining the PGA National Gold Club located in Palm Beach Gardens, Florida.  In addition, he is in the process of selling one of his two boats still located in Maine and is preparing the other to be moved to Florida.  He also works out regularly at the local gym near his home in Florida and does not belong to any gym in Maine.

In sum, Goodrich succeeds in rebutting the presumption that he continued, as of December 19, 2012, to be a citizen of Maine.  As the defendants' counsel observed at oral argument, there is no dispute that Goodrich, a man of means, was a resident of both Maine and

---

[7] At oral argument, the defendants' counsel explained that the defendants' point is not that Goodrich's motive matters, but rather that even if his showing is enough to satisfy the more lenient Florida and Maine tests of residency for tax purposes, it is not enough to establish federal diversity jurisdiction.  Goodrich had noted, *inter alia*, that, based on Florida and Maine tests that take into account factors similar to those considered for purposes of diversity jurisdiction, he meets a majority of the factors for Florida tax exemption and less than a majority of the factors for Maine voter eligibility.  *See* Plt's Suppl. Brief at 13-15; Fla. Stat. Ann. § 196.015; 21-A M.R.S.A. §112(1)(A).

Florida, as of the critical date.  As might be expected in these circumstances, Goodrich spent varying amounts of time in both states and maintained houses and personal, social, business, and other relationships in both.  The question is, in which state was he domiciled.

The preponderance of the evidence indicates that, consistent with his professed intent, Goodrich shifted "his true, fixed home and principal establishment" from Maine to Florida prior to December 19, 2012.  *Sánchez*, 629 F.3d at 41 (citation and internal quotation marks omitted). As of that time, he had ceased all active management of his business interests in Maine, commenced employment as the president of a Florida company, actively managed a blueberry farm in Florida, registered to vote there, opened a bank account there while closing his bank account in Maine, transferred all of his vehicles there save for an unregistered pickup truck, and begun receiving bills there, including bills relating to his interests in Maine.  Pursuant to the terms of a 2003 divorce decree, his children resided in Maine with their mother; however, he had the means not only to visit them in Maine but also to bring them to Florida regularly.  His girlfriend had a condo in Portland, Maine, but he testified that she stayed with him.  This suffices to show presence in Florida and intent to remain there, rebutting the presumption of continued domicile in Maine.  *See, e.g., García Pérez v. Santaella*, 364 F.3d 348, 353-54 (1st Cir. 2004) (although "not all factors weigh[ed] heavily in favor of a Florida domicile[,]" plaintiffs with ongoing connections to Puerto Rico proved a change of domicile to Florida when, *inter alia,* "business relations [in Puerto Rico] were . . . restricted to infrequent oversight[,]" "the ordinary arrangements for settling into a community were becoming stronger in Florida, by registering to vote, purchasing cars, and contracting to rent an apartment[,]" and, most importantly, there was "evidence of an intent to remain in Florida and earn a livelihood there: studying for the bar,

exploring job opportunities, planning and receiving encouragement for opening a branch office for [the plaintiff's] firm").[8]

## IV. Conclusion

For the foregoing reasons, I recommend that the defendants' motion to dismiss be **DENIED**.  Should the court agree, the Clerk's Office is **DIRECTED** to convene a status teleconference at the earliest convenience of the parties and the court to reset scheduling order deadlines as appropriate, including the scheduling of discovery on the merits of Goodrich's claim.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which <u>de novo</u> review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the district court and to appeal the district court's order.*

---

[8] The defendants rely, *inter alia*, on *Leon v. Caribbean Hosp. Corp.*, 848 F. Supp. 317 (D.P.R. 1994), in which the court found that the plaintiff had failed to overcome the presumption of continuing domicile in Puerto Rico.  *See* Dfts' Reply at 3.  *Leon* is distinguishable.  The *Leon* court deemed the plaintiff's ties to her alleged new domicile, Illinois, "superficial; easy to create, at little expense or inconvenience[,]" noting that "[c]hecking accounts are easily opened and closed[,]" "[o]btaining credit cards and check cashing cards [is] quickly accomplished and may not even require residency in the area[,]" "voter registration is indicative of very little for a person who has previously shown no interest in participating in the electoral process," and "obtaining a driver's license is not necessarily a complicated procedure for one who already has the skills." *Leon*, 848 F. Supp. at 318.  Yet, the plaintiff in *Leon* was expected to return to employment in Puerto Rico, continued to use a Puerto Rican checking account routinely, kept her home in Puerto Rico with all of its furniture unoccupied, continuing her utility services, left her late-model car in Puerto Rico, and continued to receive her main source of income, Social Security checks, at her Puerto Rico address. *See id.*  By contrast, as of the time he filed the Complaint, Goodrich had sold his interest in PowerPay and taken a job as president of a Florida company, closed his Maine bank account and opened one in Florida, shipped all of his vehicles except for an unregistered pickup truck to Florida, and received mail, including mail relating to his Maine business interests, in Florida.  While Goodrich maintained his residence in Falmouth, it was occupied by his sister as caretaker as well as by himself and his children on his trips to Maine.

Dated this 31st day of October,  2013.

> /s/  John H. Rich III
> John H. Rich III
> United States Magistrate Judge